## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THEODORA F. ANTAR *et al.*,

    *Plaintiffs,*

                                    Civil Action No. 3:23-cv-01021-JAM

    v.

HONORABLE JANE KUPSON GROSSMAN *et al.*,

    *Defendants.*

*Official and Personal Capacities*

                                        August 23, 2023

## PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE WHY COMPLAINT
## SHOULD NOT BE DISMISSED

1

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbas v. Dixon*, 480 F.3d 636, 639–40 (2d Cir. 2007)……………………………………….

*American Well Works v. Layne*, 241 US 257 (1916)……………………………………………...7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007))……………………………………….

*Collins v. Harker Heights* (1992) . . …………………………………………………………3

*Edmonson v. Leesville* Concrete Co., Inc., 500 U.S. 614 (1991)………………………….9

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*……………………...7

*Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006)…………………………..

*Gunn v. Minton,* 568 U.S. 251, 256 (2013)………………………………………………….

*Iqbal,* 556 U.S. at 678………………………………………………………………………….

*Jackson v. Metropolitan Edison Co*...……………………………………………………12

*Johannes v. Sloan,* No. 79L0169 (Cir. Ct. Kankakee Cty. Ill. March 26, 1981)…………………..

*Louisville & Nashville R. Co. v. Mottley*, 211 US 149 (1908)…………………………….....7

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–29 (2019)……………..

*Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020)……………………………….

*Memmer v. Memmer,* No. 45503 (Cir. Ct. Fairfax Cty. Va. No. 30, 1979)………………………..

*Obergefell v. Hodges*…….....…………………………………………………………….......... 2

*Osborn v. Bank of the United States*, 22 US 738 (1824)……………………………………7

*Poe v. Ullman*………………………………………………………………………...4

*Ruffalo v. United States,* 590 F. Supp. 706 (W.D. Mo. 1984)………………………………….

*Sutton v. Utah State Sch. For the Deaf & Blind,* 173 F. 3d 1226, 1236 (10th Cir. 2008)………….

*Washington v. Glucksberg* (1997)……………………………………………………….3

**Statutes & Rules**

US Const, Art III, Sec 2………………………………………………...…………………7

18 U.S.C. § 2266…………………………………………………………………………

28 USC §1331……………………………………………………...………………...7

28 U.S. Code § 1915……………………………………………………………………….

28 U.S.C. § 1367……………………………………………………………………14

Fed. R. Civ. P. 12(h)(3)……………………………………………………………….

Fed. R. Civ. P. 12(b)(6)…………………………………………………………...15

US Const., First Amendment……………………………………………………...10

Child Abuse Prevention and Treatment Act ("CAPTA")…………………………...16

Rule 65(b) of the Federal Rules of Civil Procedure………………………………...17

US Const., Fourteenth Amendment Due Process Clause………………………………...13

42 USC §1983……………………………………………………………………...21

34 U.S. Code § 12495……………………………………………………………….

S.3623 - Violence Against Women Act Reauthorization Act of 2022 TITLE XV—KEEPING CHILDREN SAFE FROM FAMILY VIOLENCE……………………………………………..

18 U.S. Code § 3524 - Child custody arrangements……………………………………….

**Law Reviews, Treatises, & Other Periodicals**

Richard A. Gardner, M.D., *The Parental Alienation Syndrome: Past, Present, and Future*...…… 13

Kenji Yoshino, *Not Whether But How: Discerning New Constitutional Freedoms*…...................2

James A. Hamilton, *Manhattan Community Access Corp. v. Halleck: Taking the Public Taking the Public out of Public Access out of Public Access*…………………………………………12

DSM5-995.51 Pathogenic Parenting…………………………………………………13

Lawrence A. Goldman, *Tortious Interference with Visitation Rights: A New and Important Remedy for Non-Custodial Parents, 20 J. Marshall L. Rev. 307 (1986)*…………………………….

*Steven L. Emanuel,* Torts Tenth Edition……………………………………………19

The Restatement (Second) of Torts §700 (1977)……………………………………………

## **INTRODUCTION**

As citizens of the United States of America, individuals are awarded certain rights, privileges, and freedoms. Said rights and freedoms are part of the very fabric of what makes America what it is, the same rights and freedoms that countless souls fought for, died for, and spent their lives trying to protect. As Americans, rights that are protected under federal law are

specified and designated explicitly in such texts such as The Constitution, as well as through Acts of Congress and other federal laws and statutes.

However, those rights are not limited in such a way that only those explicitly stated are guaranteed. Such rights as the fundamental human rights that Plaintiff and Plaintiff's two minor children possess as citizens and individuals are protected under the laws of this nation. When questions arise that have not yet been answered historically through precedent, there is an opportunity for precedent to be established, and an opportunity for cases to pave the way for the future of the application of such law. Through case law, legislative changes, and the procedure of the judiciary, laws are constantly being interpreted and changing. As Kenji Yoshino, Chief Justice Earl Warren, Professor of Constitutional Law at New York University School of Law and the Director of the Center for Diversity, Inclusion, and Belonging described this concept,

> *One of the most vibrant and contentious debates relating to the Due Process Clause concerns the "substantive due process" jurisprudence. Under this area of law, the Supreme Court has protected rights not specifically listed in the Constitution. Currently, such unenumerated rights include the right to direct the education and upbringing of one's children, the right to procreate, the right to bodily integrity, the right to use contraception, the right to marry . . . and the right to sexual intimacy. For well over a century, the Court has grappled with how to discern such rights. This controversy continues to this day, and the Court's 2015 decision in this area—*Obergefell v. Hodges—*breaks new ground in that storied debate.*

Plaintiff was born in the United States, as were both of her minor children, and all three have resided within the bounds of this nation and are entitled to the protections and freedoms that are guaranteed to us as United States citizens under The Constitution. Plaintiff is able to invoke federal subject matter jurisdiction for this case due to the extraordinary circumstances which have stripped the Plaintiff of several of her unenumerated rights, such as the right to direct the education and upbringing of her children, and the right against unreasonable interference or disturbance in visiting and having and maintaining a relationship with her children. Plaintiff's J.V. and A.L. have the constitutional and fundamental right to freely exercise their religion, to a

relationship with Plaintiff, and to preserve their relationship as siblings. Plaintiff A.L has a fundamental human right to be free from being abused.

No civilized nation should condone the continued psychological abuse and mental and emotional abuse of a young, vulnerable, impressionable child who is simultaneously being stripped of her fundamental human rights and rights to life, liberty, and many other freedoms.

Yoshino also describes the everchanging definition of which rights are and are not protected by the Constitution has been highly debated for decades. He states that "It is one thing when the Court strikes down a legitimate enactment based on some specific right spelled out in the Constitution. It is quite another thing when it invalidates such an enactment based on a right that has no textual basis within the Constitution . . . As the court itself once said, it 'has always been reluctant to expand the concept of substantive due process because guideposts for responsibly decision-making in this unchartered area are scarce and open-ended.' *Collins v. Harker Heights* (1992) . . . the idea that the Constitution *only* protects rights that are specifically mentioned is also deeply problematic."

The Constitution of the United States of America and the Ninth Amendment guarantees that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparate others retained by the people" which allows any unenumerated rights not textually found in the Constitution to nonetheless still be protections that are entitled to citizens under the fundamental human rights and other unenumerated rights. There are various approaches which one can take in order to invoke said unenumerated rights.

For example, the Court issued a decision in 1997 regarding the question of whether or not there was a fundamental right to physician-assisted suicide, in which the court ruled that there was no such right. *Washington v. Glucksberg*.

In *Glucksberg,* the Court determined that there was a two-part test that could be performed in order to determine whether or not such an unenumerated right was invokable under the 9th amendment. The test determined that, in determining whether or not a right qualified as a fundamentally protected right, the right must first be "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty" and must also require a "careful description of the liberty interest at issue."

Historically, there have been landmark cases such as *Obergefell v. Hodges* in which dramatic changes have been made and in which the very substance of the substantive due process

methodology was changed completely. This case did not fall within the traditional bounds of the test provided with *Glucksberg* and instead allowed for new rights to be created which did not qualify as being deeply rooted in the Nation's traditions and history.

Supreme Court Chief Justice Roberts noted in *Obergefell* that the case "put an end to the idea that the due process methodology was backward looking. . . [the] nature of injustice is that we may not always see it in our own times . . . The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the freedom of all persons to enjoy liberty as we learn its meaning."

Within this context, it is evident that over 230 years after the 9th amendment was ratified, society as a whole has changed drastically. The United States of America is not the same nation it was centuries ago, and the rights established then cannot and should not be limited solely to those which applied to a world that no longer exists today.

Yoshino points out a very important and powerful concept and states that,

> *Obergefell represented a clear victory for those who believe, as many progressives do, in a more expansive vision of substantive due process jurisprudence. At the same time, it did not announce unlimited discretion for the judiciary in this area. Instead, it endorsed the approach taken in a canonical dissent by Justice Harlan in the 1961 case of* <u>*Poe v. Ullman*</u>*. The Poe dissent rejected any formulaic approach to substantive due process in favor of a more open-ended common law approach whereby courts address questions about fundamental rights case-by-case, striving in each decision to balance the Constitution's respect for individual liberty and the demands of organized society. It remains to be seen what future rights such an approach might yield.*

## **STATEMENT OF FACTS**

The Court has stated that, "it appears that there is no federal jurisdiction over Antar's complaint or that the complaint alleges plausible grounds for relief under federal law, the Court shall require by August 23, 2023, that Antar either file an amended complaint that overcomes the

concerns set forth in this ruling or file a response explaining why the complaint should not be dismissed." The Plaintiff is filing this response pursuant to the order of the Court to explain why said complaint should not be dismissed and intends to file an amended complaint in addition to said response.

One of the ways in which federal jurisdiction is established is through federal question jurisdiction. In this case, Plaintiff can invoke federal question jurisdiction to demonstrate why said complaint should not be dismissed.

Generally, in order for federal question jurisdiction to exist, the cause of action must "arise under federal law." More specifically, however, there are both constitutional and statutory requirements that must be met before jurisdiction can be found. There is room for interpreting the "Arising Under" - Constitutional Requirement, and this is a subject which has been long debated historically.

Under Article III of the Constitution, federal courts can hear "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States..." US Const, Art III, Sec 2. The Supreme Court has interpreted this clause broadly, finding that it "allows federal courts to hear any case in which there is a federal ingredient." *Osborn v. Bank of the United States*, 22 US 738 (1824).

Furthermore, the courts have also established that, "in order for federal question jurisdiction to exist, the requirements of 28 USC 1331 must also be met." This statute gives federal courts jurisdiction only to those cases which "aris[e] under" federal law. 28 USC 1331. This requirement has been found to be narrower than the requirements of the constitution. The Supreme Court has found that a "suit arises under the law that creates the cause of action," *American Well Works v. Layne*, 241 US 257 (1916), and therefore, only suits based on federal law, not state lawsuits, are most likely to create federal question jurisdiction, *Louisville & Nashville R. Co. v. Mottley*, 211 US 149 (1908).

In order to determine whether or not federal question jurisdiction is present, courts can conduct an analysis through the "Well-Pleaded Complaint Test - Mottley Rule"

Typically, in order to have federal question jurisdiction, "the plaintiff's complaint must be a well-pleaded one." This means that the plaintiff's initial complaint must contain references to the federal question and the federal issue evoked. The federal question and issue cannot arise in an anticipated defense, it must be presented from the initial complaint. This requirement was

established in _Louisville & Nashville R. Co. v. Mottley_, and as such it is often referred to as the "_Mottley_ Rule."

Plaintiff intends to submit her amended well-pleaded complaint to contain said references to the federal question and the federal issue evoked in this case.

An additional test that has been used by the courts historically to determine federal question jurisdiction is that of the "Grable Test"

This test was established in _Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing_. This is a two-part test which analyzes the following questions:

1. Does the claim have a "federal ingredient" for federal question jurisdiction under Article III Section 2 of the Constitution?

2. Does the claim meet the requirements for 28 USC 1331 federal question jurisdiction?

Plaintiff is able to show that there is in fact a federal ingredient to establish said federal question jurisdiction under Article III Section 2 of the Constitution, and that the claim meets the requirements for 28 USC 1331.


## ARGUMENT


In the Court's Order to Show cause why case should not be dismissed, the order states that, "It does not appear to me that the complaint alleges a violation of federal law to give rise to federal question jurisdiction. The complaint alleges numerous counts that arise under state law for sexual harassment (Count One), threatening (Count Two), harassment (Count Three), and intentional infliction of emotional distress (Counts Four to Twenty-One)."

Plaintiff is able to allege through her amended complaint violations of federal law that give rise to federal question jurisdiction, even if said violations are not evident through Plaintiff's initial complaint. Although the actions of the defendants as described through the aforementioned counts of Plaintiff's complaint would, in fact, constitute violations of state law, they are just ingredients of the overall recipe of the larger picture of Plaintiff and Plaintiff's minor children's rights being violated under federal law. Plaintiff can articulate the basis for said federal question jurisdiction and can show that there is no adequate remedy at law currently available for Plaintiff through the state court for the injunctive relief that Plaintiff is seeking.

The Court states that, "The complaint does not state a claim for a violation of the Constitution because it does not allege that the defendants are government or state actors."

In response to the above, Plaintiff's argument is that she is legally able to pursue a claim for violations of her and her minor children's Constitutional and fundamental rights both enumerated and unenumerated in The Constitution regardless of whether or not the defendants are "government or state actors." The Supreme Court of the United States of America has stated that, in regard to violations of constitutional rights, "Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints."
*Edmonson v. Leesville* Concrete Co., Inc., 500 U.S. 614 (1991)

In this action, Plaintiff is facing an extraordinary and unprecedented level of circumstances which meet the criteria described in *Edmonson.* In this case, the governmental authority which dominates the activities of the defendants is the New Haven Superior Court at 235 Church St, New Haven, CT, 06510, specifically Judge Jane Kupson Grossman, Presiding Judge, Family Matters. On May 25, 2023, Judge Jane Kupson Grossman violated Plaintiff's substantive and procedural due process rights and transferred sole legal and physical custody of Plaintiff A.L. to defendant Matthew J. Lodice without giving Plaintiff an opportunity to be sworn in, testify, show or present evidence, or otherwise defend any of the false and damaging accusations that were presented by defendant Matthew J. Lodice to said judicial authority on said date.[1]

As of the May 25, 2023 date, the Judge Jane Kupson Grossman deemed the defendant Matthew J. Lodice as being qualified to act with the authority of the government by giving him the power to control if, when, and how Plaintiff Theodora F. Antar would ever see her minor daughter A.L. again. The Judge Jane Kupson Grossman acted in a way that is highly unusual for a state court in family matters to act, by vesting the power and authority that she possessed into the defendant, allowing him to act as the judicial authority.

Although Defendant Matthew J. Lodice and all of his accomplice defendants are "private parties," in that they do not have employment provided by the State of Connecticut, the fact that

---

[1] See exhibit 1: Transcript from 5/25/2023 hearing with Judge Jane Kupson Grossman

9

Defendant Matthew J. Lodice was deemed worthy by the state[2] to be given the absolute, complete, and unequivocal power and authority to control and dominate the activities of Plaintiff's visitation, access, communication, and involvement with the upbringing of her minor child allows him to, through powers vested in him through a governmental authority, dominate, control, and manipulate Plaintiff's activities to such an extent that he is undeniably deemed to act with the authority of the government and, as a result, be subject to constitutional constraints."

*Edmonson v. Leesville* Concrete Co., Inc., 500 U.S. 614 (1991)

The Defendant Matthew J. Lodice has stated, on numerous occasions, that he is in full control of if, when, where, how, and with whom the Plaintiff can exercise her constitutional right to raising and upbringing and visitation of her child. He has stated the same in regard to the Plaintiff A.L. and has denied her the right to free practice of her religion under the First Amendment by refusing to allow her to attend religious services and denying her access to her faith, religious education, or religious sacraments. The First Amendment allows for the Plaintiff A.L. to freely exercise her religion without interference from the state, or anyone illegally acting as the state, regardless of if they are employed by said state in any official capacity or role. The Defendant Matthew J. Lodice is not a member of Congress of the United States Government or the State of Connecticut. However, Plaintiff A.L. still has the fundamental right under the United States Constitution First Amendment which states that she is protected against "infring[ement] upon the freedom of . . . religion."

Defendant Matthew J. Lodice, acting under color of law, has infringed upon Plaintiff A.L.'s fundamental and constitutional First Amendment protection of the freedom to practice her religion. Said Plaintiff is a member baptized under the Greek Orthodox Church of Saint Barbara in Orange, Connecticut, and is protected under the Greek Orthodox Archdiocese of America and has the right to attend religious services, practice her faith, attend religious educational classes in which she is enrolled, and to pray, receive sacraments, and partake in other mysteries of the religion that are protected from interference. Plaintiff A.L. has the right, regardless of her age, mental capacity, or understanding of that right to freely practice her religion in this country as a United States Citizen, and nobody can legally infringe upon that right as it is bestowed upon her, and she is wholly entitled to such.

---

[2] State can be taken to be used interchangeably with the State of Connecticut Superior Court Judge Jane Kupson Grossman who transferred judicial authority to the Defendant.

This well-known state action doctrine as applied to the first amendment explains that "in order for a plaintiff to have standing to sue over a law being violated, the plaintiff must demonstrate the government (local, state, or federal), was responsible for the violation, rather than a private actor. This requirement only applies when the law in question requires the government to have acted. This state action requirement extends to a number of actions."

In this action, Plaintiff is able to demonstrate that the government, under the authority of Judge Jane Kupson Grossman acting as the controlling authority of the State, was responsible for each and every one of Plaintiff and Plaintiff's minor children's rights violations, as a result of the transfer of power that said government official bestowed upon the Defendant. The Defendant was then able to bestow the same powers to each of the other Defendants as part of an overall conspiracy to try to isolate, abuse, harass, and torture the Plaintiff and her minor children.

The Defendant Matthew J. Lodice was instructed[3] by Judge Jane Kupson Grossman on June 15, 2023, at a hearing in the New Haven Superior Court at 235 Church St., New Haven, CT, that he must provide Plaintiff Theodora F. Antar with a "regular schedule" in which she can see Plaintiff A.L. Since that date, Defendant Matthew J. Lodice has refused to do so, stating that he has the absolute authority to dictate if, when, how, and in what manner Plaintiff Theodora Antar could visit her minor child A.L., and stated that Judge Jane Kupson Grossman "made it very clear[4] that the power and discretion was completely up to him."

The Defendant Matthew J. Lodice has stated repeatedly and adamantly that he has full discretion and control over Plaintiff Theodora Antar's access to and right to visit, partake in caring for, and participating in raising of her minor child A.L., and has stated that he has the authority to psychologically, physically, or emotionally abuse her, has the authority to medically and psychologically neglect her care, and has the authority to forbid Plaintiff from taking any legal action to modify or change any of that power. The Judge Jane Kupson Grossman has adamantly and repeatedly stated that the only motions that can go forward in the New Haven Superior Court are those involving financial issues and strictly related to issues involving how much child support Plaintiff should pay Defendant, despite the excessively high balance of arrears that the Defendant currently owes Plaintiff.

---

[3] See exhibit 2, Transcript from 6/15/23 hearing with Judge Jane Kupson Grossman
[4] See exhibit 3, OurFamilyWizard message communication record from 5/25/23 to present

As such, the Defendant Matthew J. Lodice and his accomplices are all acting under color of state law, with the power vested in them through the State of Connecticut Presiding Judge for Family Matters in Superior Court Judge Jane Kupson Grossman, who has affirmed that no emergency motions will be heard, no restraining orders can be filed, and no applications for relief from any type of abuse in the form of an injunction or other relief can be sought by Plaintiff Theodora F. Antar.

Judge Jane Kupson Grossman stated on December 1, 2022 that she would make it so that the Plaintiff can "never file for a restraining order again" and has put in illegal and unethical and unconstitutional barriers in place to prevent Plaintiff from doing so. In spite of the level of abuse, neglect, or other valid concerns that are gross violations under the State law and constitute abuse on a criminal level, the Judge has stated that the absolute authority regarding the Plaintiff's access to her minor child A.L. is vested in the power of the Defendant Matthew J. Lodice. Any and all motions for emergency ex-parte custody, TRO, or other motions to modify or hold the Defendant Mr. Lodice in contempt have been rejected, denied, or both, in a strategic calculated effort on behalf of Judge Jane Kupson Grossman to allow the Defendant Matthew J. Lodice to retain the absolute authority regarding the visitation and access activities of her minor child A.L.

In analyzing whether or not an individual can qualify as a state actor in this manner, the court has applied various tests in order to determine an answer. "This has led, over time, to the development of the state-action doctrine, under which only state actors—not private actors—can be held liable for constitutional violations. However, as the Court has observed, 'cases deciding when private action might be deemed that of the state have not been a model of consistency.' Although the Court emphasizes that the facts and circumstances of any given case will determine whether state action is present, there are some tests that the Court has developed to distinguish private action from state action."

## A. State-Action Requirement in Constitutional Violations

Although it is generally widely accepted that the First Amendment's freedom of speech guarantee protects only against governmental interference, and not private interference, courts have been known to apply the state action doctrine in cases where it is necessary "to demarcate the boundary between proscribed governmental interference and permitted private interference with free speech rights." James A. Hamilton describes this in more detail in his analysis provided in his law review article. He states the following:

*There are multiple potential avenues to a finding of state action, the most relevant of which are: the exercise by the private entity of a traditional, exclusive public function; governmental encouragement of the private actor; and joint activity or entwinement between the government and the private actor. The leading case on the exclusive public function test is Jackson v. Metropolitan Edison Co. In Jackson, the Court reasoned that when a private actor exercises public functions "traditionally associated with sovereignty," state action is present. In this case, the Court considered whether state action was present when an electric utility company cut off service to a customer without adequate notice. The petitioner contended that state action was present because the state had granted the electric company a monopoly and required the company to provide "reasonably continuous" service within the state. The Court rejected this argument because state law only imposed the service obligation on the utility company, not on the state itself. Supplying electric service is not, the Court held, "traditionally the exclusive prerogative of the state." As a result, the Court concluded that the utility company fell outside the ambit of the due process protections of the Fourteenth Amendment."*

In this action, however, the rights that are being violated on behalf of the Plaintiffs are clearly protected under federal and constitutional law, and would arguably be enforceable by the private entity Defendant Matthew J. Lodice who is acting with the monopoly of power that was encouraged by the government actor of Judge Jane Kupson Grossman in which he is able to deny Plaintiff Theodora F. Antar visitation, access, or involvement with her minor child A.L., while simultaneously allowing and providing Plaintiff Theodora F. Antar no adequate remedy at law to prevent her minor child A.L. from being subjected to further emotional, mental, psychological, physical, and sexual abuse while being unlawfully and unreasonably isolated completely from the entirety of her family and support network.

Defendant Matthew J. Lodice's deliberate attempt to psychologically abuse and isolate the Plaintiffs Theodora F. Antar and her minor daughter A.L. from one another, and also isolate A.L. from her sibling J.V. has caused irreparable harm to the Plaintiff's family unit, which will take years, if not the rest of the Plaintiff's lifetimes, to try to work on healing. The trauma that

the Plaintiffs have been subjected to is immeasurable, and can not be adequately expressed through words, as it is akin to torture in the worst possible sense of the word.

Richard A. Gardner, M.D., describes the phenomenon, which is now clinically referred to as "DSM5-995.51 Pathogenic Parenting" which occurs in situations where children are isolated and alienated from their protective parent in his article on *The Parental Alienation Syndrome: Past, Present, and Future.* Gardner states that he observes "programming ("brainwashing") of the child by one parent to denigrate the other, but also self-created contributions by the child in support of the alienating parent's campaign of denigrations against the alienated parent" which he coins as part of his parental alienation syndrome.

Gardner defines this syndrome as:

*"a childhood disorder that arises almost exclusively in the context of child-custody disputes. It's primary manifestation is the child's campaign of denigration against a good, loving parent—a campaign that has no justification. It results from the combination of programming (brainwashing) parent's indoctrinations and the child's own contributions to the vilification of the target parent. When true parents abuse and/or neglect is present, the child's animosity may be justified and so the parental alienation syndrome explanation for the child's hostility is not applicable."*

Gardner further notes that the term "PAS is applicable only when the target parent has not exhibited anything close to the degree of alienating behavior that might warrant the campaign of vilification exhibited by the children. Rather, in typical cases the victimized parent would be considered by most people to have provided a normal, loving parenting or, at worst, exhibited minimal impairments in parental capacity. It is the exaggeration of minor weaknesses and deficiencies that is the hallmark of the PAS."

Additionally, Gardner touches upon the systematic pattern of courts denying and diminishing the procedural due process rights of litigants who come from lower socio-economic statuses. He states a valid point in bringing up the fact that "the poorer the client, the shorter the trial . . . The more money the clients have, the longer the trial. In fact, litigated child-custody disputes are generally a prerogative of the rich and not something that most poor people can afford."

14

Gardner also points out a very important issue by explaining that "some judges, especially those who are not properly knowledgeable about the PAS, have 'bought into' this argument, failing thereby to recognize the bona fide abuse that was actually taking place in the case."

It is evident in this action that the Defendant Matthew J. Lodice's actions are akin to parental alienation, isolation, psychological abuse, coercion, and torture. As citizens of the United States of America, Plaintiff and her minor children are protected under federal laws, treaties, and acts of Congress to prevent being subjected to such.

Even if the Court claims that there is no federal question jurisdiction, 28 U.S.C. §1367 "provides for supplemental jurisdiction in federal courts. Supplemental jurisdiction allows a federal court to adjudicate a claim over which it does not have independent subject-matter jurisdiction, on the basis that the claim is related to a claim over which the federal court *does* have independent jurisdiction."

In this action, the Court has both independent subject-matter jurisdiction and supplemental jurisdiction over several of the claims, which will be clearly laid out in Plaintiff's amended complaint to conform with the request of the order of the Court. The Plaintiff also argus that, in the sense that federal and state courts have concurrent subject-matter jurisdiction over many issues, that parties are allowed to choose whether to litigate in a federal or state tribunal.

Plaintiff Theodora F. Antar has been denied her legal right to litigate said claims in the state tribunal due to being blocked from litigating and blocked from procedural and substantive due process rights by being subjected to illegal actions by Judge Jane Kupson Grossman, which include, but are not limited to, her transferring her judicial authority regarding the Plaintiff's parental access, visitation, and ability to enjoy the right to raise her child solely to the Defendant Matthew J. Lodice without allowing the Plaintiff any remedy to modify, vacate, or otherwise intervene in the transfer of power that had no legal or factual grounds to rely upon when it was conducted.

Judge Jane Kupson Grossman altered the Defendant Matthew J. Lodice, and vicariously altered the accomplice defendants, by giving that absolute, indefinite, full control and power to the private individual which should have been reserved for the state. Therefore, Plaintiff is able

15

to show that the Federal Court should have the jurisdiction over the matter as in this case, many federal questions are being challenged.

Furthermore, the Federal Rules of Civil Procedure Rule 12(b)(6) states that "The purpose of a motion to dismiss . . . is to test the sufficiency of a plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind,* 173 F. 3d 1226, 1236 (10th Cir. 2008). Furthermore, the court has rules that, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)).

The Court states that "Child Abuse Prevention and Treatment Act ("CAPTA") is inactionable because it does not create a private right of action, but Plaintiff respectfully disagrees in that Plaintiff cited said Federal Act of Congress because of section 110-111 of said act in which several child abuse terms are defined under federal law.

Federal law permits for injunctive relief in the form of a restraining order or injunction. Plaintiff filed this action in Federal District Court invoking federal question jurisdiction on the emergency basis of the facts which allege serious allegations of neglect, abuse, harassment, and other forms of psychological abuse and coercion.

The Child Abuse Prevention and Treatment Act provides for the necessary "federal ingredient" to invoke said federal question jurisdiction of this Court, and for good reason.

For example, CAPTA, which was enacted to protect children, just as Plaintiff is attempting to due through this order of restraint, defines sexual abuse as abuse that "includes— A. the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct for the purpose of producing a visual depiction of such conduct; or B. the rape, and in cases of caretaker or inter-familial relationships, statutory rape, molestation, prostitution, or other form of sexual exploitation of children, or incest with children."

The act also redefines child abuse and neglect to include, "at a minimum, any recent act or failure to act on the part of parent or caretaker, which results in death or serious physical or emotional harm, sexual abuse or exploitation, or an act or failure to act which presents an imminent risk of serious harm; and (2) 'sexual abuse' to include the statutory rape of children in cases of caretaker or inter-familial relationships."

Temporary restraining orders (TRO), which is the type of action initiated here by Plaintiff, despite her also citing violations of federal, constitutional, and state rights and privileges, are short-term pre-trial temporary injunctions. To obtain a TRO, a party must "convince the judge that he or she will suffer immediate irreparable injury unless the order is issued."

In this case, Plaintiff will demonstrate through her amended complaint that there is a clear, convincing, and strong probability that the plaintiffs will continue to suffer immediate irreparable injuries unless this order is issued. In terms of a federal TRO or injunction, "If the judge is convinced that a temporary restraining order is necessary, he or she may issue the order immediately, without informing the other parties and without holding a hearing. These orders are intended to be stop-gap measures, and only last until the court holds a hearing on whether or not to grant a preliminary injunction. Judges' decisions on whether or not to issue a TRO may not be appealed. Because a TRO may be issued without informing the other party and without holding a hearing, many courts will refuse to issue them, but will instead grant a preliminary injunction after a hearing."

In the federal courts, a TRO is governed by Rule 65(b) of the Federal Rules of Civil Procedure. State rules regarding TROs and other injunctions vary from state to state. *See* State Civil Procedure Rules.

Courts will typically use this 2-part test to determine whether to issue a TRO under the following circumstances:

1. If it clearly appears from specific facts shown by an affidavit or by verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, AND

2. That applicant's attorney certifies to court in writing and efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Plaintiff will show through her amended complaint, even more so than in her initial complaint, more clear, detailed information and evidence/documentation to support her claims that there "clearly appears from specific facts in the affidavit by verified complaint that immediate and irreparable injury, loss, or damage will result to the applicants before the

adverse parties or their attorneys can be heard in opposition." Plaintiff also provided notice already, although Plaintiff strongly feels it should not have even been required due to the severity of the situation at hand.

**B.** **There is substantial federal jurisdiction over Plaintiff's complaint, which will be amended to clarify and show such jurisdiction, and Plaintiff's complaint alleges plausible grounds for relief under federal law**

Plaintiff argues further, in response to the Court's order to show cause why complaint should not be dismissed, that there are additional details and facts which will be included in her amended complaint which she intends to file timely with the court prior to the August 23, 2023, deadline provided by the Court.

The complaint is more than just that of Defendant Scott Lodice "interfering with the contact" which constitutes interference within the depths of Plaintiff's complaint, which will be evident in its amended version. Defendant Scott Lodice specifically subjected the Plaintiff to harassment, custodial interference, sexual harassment, threatening, and other forms of psychological abuse, as well as tortious interference with visitation rights. Defendant Scott Lodice is the paternal uncle of the Plaintiff A.L. and Defendant Matthew J. Lodice is the biological father of the Plaintiff A.L. Both Defendants have engaged in threatening, harassment, sexual harassment, intimidation, coercion, and tortious interference with visitation rights of Plaintiff Theodora F. Antar on repeated, and unwavering basis.

Further, Plaintiff represents that the conduct of the Defendant Matthew J. Lodice against the Plaintiff Theodora F. Antar is extreme and extraordinary in nature, measuring far beyond the simple description of "interfering in the contact" that all three Plaintiffs have with one another. The emotional distress that Plaintiffs have all been subjected to as a result of the collective actions of all defendants is immeasurable, and Plaintiffs have been required to obtain additional treatment for the post-traumatic stress of the trauma of the psychological abuse that they are all subjected to on a daily basis by the defendants.

The Plaintiff can show, through her amended complaint which will be timely filed, that this complaint is in no way "frivolous or malicious" despite Plaintiff's indigent status at the present moment and inability to afford the cost of filing in a non forma pauperis fashion. Plaintiff is a single mother who has sole legal and physical custody of Plaintiff J.V. and is

responsible for financially supporting both Plaintiffs J.V. and A.L. as their mother and legal guardian. Plaintiff is also a law student at the University of Connecticut School of Law as a prospective J.D. Candidate with an anticipated graduation date of May 2025, and is currently participating in an unpaid internship that prevents her from being able to work or earn income at this time.

Despite the fact that Plaintiff is a pro se litigant with a pro se complaint, Plaintiff can demonstrate through her amended complaint that the complaint must survive dismissal because the "factual allegations do . . . establish plausible grounds for relief."

The Plaintiff can also address the concerns stated in the order to show cause why complaint should not be dismissed via her amended complaint.

In terms of remedies available at law for individuals facing such extraordinary circumstances, as Lawrence A. Goldman stated, "noncustodial parents often lack adequate legal remedies. To combat this problem, there is a trend developing among many jurisdictions to recognize a noncustodial parent's right to bring a tort action against an interfering custodial parent or another third party.

For instance, in *Ruffalo v. United States,* a non-custodial mother was awarded damages for the government's tortious interference with her visitation rights.

Similarly, in *Memmer v. Memmer,* A noncustodial father was awarded twenty-five thousand dollars for emotional distress which resulted from the custodial parent violating his visitation right.

As described in Goldman's law review article, the courts have historically sought to "recognize a specific cause of action for tortious interference with a noncustodial parent's visitation rights."

The Court in *Ruffalo* also held that "a noncustodial parent could bring a specific cause of action for tortious interference with visitation. In order for the noncustodial parent to sustain such a claim he had to establish the defendant's interference was intentional and that he suffered compensable damages."

In this action, Plaintiff Theodora F. Antar, as the noncustodial parent at the present moment, cites tortious interference with visitation as one of the major points for the necessity stemming behind the TRO. Plaintiffs have all suffered severe compensable damages that will

likely require future long-term treatment and ongoing care. Plaintiff can also prove that the defendants all intentionally engaged in said interference.

The actions of Defendant Matthew J. Lodice toward Plaintiff A.L. also constitute that of false imprisonment, which is traditionally defined as the "intentional infliction of a confinement" in which the Plaintiff A.L., on numerous occasions, has been "held within certain limits by means of both threats and assertions of legal authority." *Steven L. Emanuel,* Torts Tenth Edition

Plaintiff A.L. was subjected to said conditions on numerous occasions, was and is aware of the confinement, and suffered and continues to suffer grave emotional and psychological harm, in addition to the psychological and emotional harm suffered by Plaintiffs Theodora F. Antar and J.V., who are deeply traumatized by said confinement.

Furthermore, as described by Emanuel, in terms of intentional infliction of emotional distress, the presence of "extreme/outrageous conduct of severe emotional or mental distress, even in the absence of actual harm" is sufficient to establish the claim of IIED. In terms of proving intent, culpability is established and will be elaborated on in Plaintiff's amended complaint by showing that defendants "(1) desired to cause Plaintiffs emotional distress, (2) knew with substantial certainty that Plaintiffs would suffer emotional distress, and (3) recklessly disregarded the high probability that emotional distress would occur" and intentionally subjected Plaintiffs to said emotional distress.

Furthermore, Plaintiffs A.L. and J.V. are able to also bring claims of IIED against defendants for their actions that were directed at Plaintiff Theodora F. Antar through the doctrine of "transferred intent" which states that "if a defendant directs his conduct to a member of Plaintiff's immediate family, Plaintiff is present, and Plaintiff's presence is known to said defendant" that the doctrine of transferred intent will apply.

As far as the "extreme and outrageous" component, Plaintiff can also demonstrate clearly that the conduct was "extreme and outrageous and beyond all possible bounds of decency" given the facts as alleged and as they will be amended in plaintiff's amended complaint which is to be filed subsequent to this filing.

Moreover, Plaintiff can show that both Plaintiffs J.V. and A.L. suffered actual severe distress emotionally that was severe enough for them to seek medical aid that will likely

continue to require treatment indefinitely. Plaintiffs J.V. and A.L. suffered from transferred intent of IIED that was directed at Plaintiff Theodora F. Antar, and Plaintiff Theodora F. Antar suffered from transferred intent of IIED that was directed at A.L. and J.V.

Defendant Matthew J. Lodice has also subjected Plaintiff Theodora F. Antar, J.V. and A.L. to invasion of privacy, by placing said plaintiffs in a false light, and giving undue publicity to their private life and matters by continuously slandering, defaming, and attempting to attack their credibility.

In terms of the constitutional requirement that the publicized details not be of legitimate public concern, the details in the complaint meet said requirement. Furthermore, the public and repeated placing of Plaintiffs in the public eye in a false light constitutes conduct which is highly offensive to a reasonable person.

Furthermore, the Defendant Matthew J. Lodice is also liable for the tort of unwarranted judicial proceedings, wrongful institution of civil proceedings, and abuse of process. Plaintiff can show as per the details in her amended complaint that this defendant has engaged in conduct in which he initiated civil proceedings against Plaintiff, did not have probable cause to believe that his claim was justified, and the proceedings were started for an improper purpose in a sole effort to harass, abuse, and subject the Plaintiff to further emotional distress and harm by isolating her and J.V. from Plaintiff A.L.

Furthermore, Defendant Matthew J. Lodice is also responsible for abuse of process, in that he involved Plaintiff in civil proceedings and used various litigation devices for improper purposes, such as harassment and abuse.

Courts have often ruled that a family member's right against "interference in having the continued affections of the other member of his family is sometimes protected" as described by Emanuel. In this case, all defendants are liable for alienation of affection, in that they have attempted to cause Plaintiff A.L. to lose her affection for Plaintiffs Theodora F. Antar and J.V.

Defendants in this action have collaborated collectively to compel Plaintiff A.L. to leave and never return to her home, despite there being no restriction on her being at her home by any court of law.

Further, the Plaintiff A.L., on numerous occasions, alleged and never denied that she had been subjected to sexual intercourse with the defendant D.L., which would also allow for a claim of alienation of affection against Plaintiffs Theodora F. Antar and J.V.

Emanuel elaborates upon the fact that in certain cases, one may also have a claim for interference with civil rights when a defendant interferes with one's civil rights. For instance, 42 U.S.C. §1983 allows a person to "bring a tort action against any person who, 'under color of' state law, deprives the plaintiff of 'any rights, privileges, or immunities' secured by the federal Constitution or a federal statute."

In addition, S.3623 - Violence Against Women Act Reauthorization Act of 2022 TITLE XV—KEEPING CHILDREN SAFE FROM FAMILY VIOLENCE also provides laws which create additional rights for victims.

LAWS.—The laws described in this paragraph are the following:

"(A) A law that ensures that, with respect to a child custody proceeding in which a parent has been alleged to have committed domestic violence or child abuse, including child sexual abuse—

"(i) expert evidence from a court-appointed or outside professional relating to the alleged abuse may be admitted only if the professional possesses demonstrated expertise and clinical experience in working with victims of domestic violence or child abuse, including child sexual abuse, that is not solely of a forensic nature; and

"(ii) in making a finding regarding any allegation of domestic violence or child abuse, including child sexual abuse, in addition to any other relevant admissible evidence, evidence of past sexual or physical abuse committed by the accused parent shall be considered, including—

"(I) any past or current protection or restraining orders against the accused parent;

"(II) sexual violence abuse protection orders against the accused parent;

"(III) arrests of the accused parent for domestic violence, sexual violence, or child abuse; or

"(IV) convictions of the accused parent for domestic violence, sexual violence, or child abuse.

"(B) A law that ensures that, during a child custody proceeding—

"(i) a court may not, solely in order to improve a deficient relationship with the other parent of a child, remove the child from a parent or litigating party—

"(I) who is competent, protective, and not physically or sexually abusive; and

"(II) with whom the child is bonded or to whom the child is attached;

"(ii) a court may not, solely in order to improve a deficient relationship with the other parent of a child, restrict contact between the child and a parent or litigating party—

"(I) who is competent, protective, and not physically or sexually abusive; and

"(II) with whom the child is bonded or to whom the child is attached;

"(iii) a court may not order a reunification treatment, unless there is generally accepted and scientifically valid proof of the safety, effectiveness, and therapeutic value of the reunification treatment;

"(iv) a court may not order a reunification treatment that is predicated on cutting off a child from a parent with whom the child is bonded or to whom the child is attached; and

"(v) any order to remediate the resistance of a child to have contact with a violent or abusive parent primarily addresses the behavior of that parent or the contributions of that parent to the resistance of the child before ordering the other parent of the child to take steps to potentially improve the relationship of the child with the parent with whom the child resists contact.

"(C) A law that requires judges and magistrates who hear child custody proceedings and other relevant court personnel involved in child custody proceedings, including guardians ad litem, best interest attorneys, counsel for children, custody evaluators, masters, and mediators to complete, with respect to the training program described in paragraph (5)—

"(i) not less than 20 hours of initial training; and

"(ii) not less than 15 hours of ongoing training every 5 years.

"(4) UNIFORM REQUIRED STANDARDS.—The standards described in this paragraph are uniform required standards that—

"(A) apply to any neutral professional appointed by a court during a child custody proceeding to express an opinion relating to abuse, trauma, or the behaviors of victims and perpetrators of abuse and trauma; and

"(B) require that a professional described in subparagraph (A) possess demonstrated expertise and clinical experience in working with victims of domestic violence or child abuse, including child sexual abuse, that is not solely of a forensic nature.

"(5) TRAINING AND EDUCATION PROGRAM.—The training program described in this paragraph is an ongoing training and education program that—

"(A) focuses solely on domestic and sexual violence and child abuse, including—

"(i) child sexual abuse;

"(ii) physical abuse;

"(iii) emotional abuse;

"(iv) coercive control;

"(v) implicit and explicit bias, including biases relating to parents with disabilities;

"(vi) trauma;

"(vii) long- and short-term impacts of domestic violence and child abuse on children; and

"(viii) victim and perpetrator behavior patterns and relationship dynamics within the cycle of violence;

"(B) is provided by—

"(i) a professional with substantial experience in assisting survivors of domestic violence or child abuse, including a victim service provider (as defined in section 40002 of the Violence Against Women Act of 1994 (34 U.S.C. 12291)); and

"(ii) if possible, a survivor of domestic violence or child physical or sexual abuse;

"(C) relies on evidence-based and peer-reviewed research by recognized experts in the types of abuse described in subparagraph (A);

"(D) does not include theories, concepts, or belief systems unsupported by the research described in subparagraph (C); and

"(E) is designed to improve the ability of courts to—

"(i) recognize and respond to child physical abuse, child sexual abuse, domestic violence, and trauma in all family victims, particularly children; and

"(ii) make appropriate custody decisions that—

"(I) prioritize child safety and well-being; and

"(II) are culturally sensitive and appropriate for diverse communities.

§12495. Right to report crime and emergencies from one's home

*(a) Definition*

In this section, the term "covered governmental entity" means any municipal, county, or State government that receives funding under section 5306 of title 42.

*(b) Right to report*

*(1) In general*

Landlords, homeowners, tenants, residents, occupants, and guests of, and applicants for, housing—

(A) shall have the right to seek law enforcement or emergency assistance on their own behalf or on behalf of another person in need of assistance; and

(B) shall not be penalized based on their requests for assistance or based on criminal activity of which they are a victim or otherwise not at fault under statutes, ordinances, regulations, or policies adopted or enforced by covered governmental entities.

*(2) Prohibited penalties*

Penalties that are prohibited under paragraph (1) include—

(A) actual or threatened assessment of monetary or criminal penalties, fines, or fees;

(B) actual or threatened eviction;

(C) actual or threatened refusal to rent or renew tenancy;

(D) actual or threatened refusal to issue an occupancy permit or landlord permit; and

(E) actual or threatened closure of the property, or designation of the property as a nuisance or a similarly negative designation.

*(c) Reporting*

Consistent with the process described in section 5304(b) of title 42, covered governmental entities shall—

(1) report any of their laws or policies, or, as applicable, the laws or policies adopted by subgrantees, that impose penalties on landlords, homeowners, tenants, residents, occupants, guests, or housing applicants based on requests for law enforcement or emergency assistance or based on criminal activity that occurred at a property; and

(2) certify that they are in compliance with the protections under this part or describe the steps the covered governmental entities will take within 180 days to come into compliance, or to ensure compliance among subgrantees.

*(d) Implementation*

The Secretary of Housing and Urban Development and the Attorney General shall implement and enforce this subpart consistent with, and in a manner that provides, the same rights and remedies as those provided for in title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 et seq.).

*(e) Subgrantees*

For those covered governmental entities that distribute funds to subgrantees, compliance with subsection (c)(1) includes inquiring about the existence of laws and policies adopted by subgrantees that impose penalties on landlords, homeowners, tenants, residents, occupants,

guests, or housing applicants based on requests for law enforcement or emergency assistance or based on criminal activity that occurred at a property.

(Pub. L. 103–322, title IV, §41415, as added Pub. L. 117–103, div. W, title VI, §603, Mar. 15, 2022, 136 Stat. 885.)


What is child abuse or. neglect? What is the definition of child abuse and neglect?
There are various types of abuse and neglect, and the symptoms of abuse and neglect may vary from child to child. The Child Welfare Information Gateway has a fact sheet that may be of help.

Recognizing Child Abuse and Neglect: Signs and Symptoms

Child Abuse and Neglect Definition

Federal legislation provides guidance to states by identifying a minimum set of acts or behaviors that define child abuse and neglect. The Federal Child Abuse Prevention and Treatment Act (CAPTA) - PDF (42 U.S.C.A. § 5106g), as amended by the CAPTA Reauthorization Act of 2010, defines child abuse and neglect as, at minimum:

- "Any recent act or failure to act on the part of a parent or caretaker which results in death, serious physical or emotional harm, sexual abuse or exploitation"; or
- "An act or failure to act which presents an imminent risk of serious harm."

This definition of child abuse and neglect refers to parents and other caregivers. A "child" under this definition means a person who is younger than age 18 or who is not an emancipated minor.

Glucksberg, 521 U.S. 702 (1997), that the Constitution, and specifically the Due Process Clause of the Fourteenth Amendment, protects the fundamental right of parents to direct the care, upbringing, and education of their children

42 U.S. Code § 9858o - Parental rights and responsibilities

Tradition of Parental Rights

Our nation has consistently maintained that parents possess a fundamental right to raise their children as they see fit.

This belief has been upheld in numerous Supreme Court cases that reflect the American people's longstanding commitment to parental rights. The excerpts below are drawn from key Supreme Court cases protecting the right of parents to raise their children. The principles below are referred to as the Parental Rights Doctrine.

**Case index:**

- *Meyer v. State of Nebraska*, 262 U.S. 390 (1923)
- *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)
- *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158 (1944)
- *Ginsberg v. New York*, 390 U.S. 629 (1968)
- *Wisconsin v. Yoder*, 406 U.S. 205 (1972)
- *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974)
- *Moore v. East Cleveland*, 431 U.S. 494 (1977)
- *Smith v. Organization of Foster Families*, 431 U.S. 816 (1977)
- *Quilloin v. Walcott*, 434 U.S. 246 (1978)
- *Parham v. J. R.*, 442 U.S. 584 (1979)
- *Santosky v. Kramer*, 455 U.S. 745 (1982)
- *Reno v. Flores*, 507 U.S. 292 (1993)
- *Washington v. Glucksburg*, 521 U.S. 702 (1997)
- *Troxel v. Granville*, 530 U.S. 57 (2000)

---

*It is the natural duty of the parent to give his children education suitable to their station in life.*

**- *Meyer v. State of Nebraska*, 262 U.S. 390 (1923)**

---

*The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and*

*direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.*

**- *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)**

---

*It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . It is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.*

**- *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158 (1944)**



*The values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society.*

*Even more markedly than in Prince, therefore, this case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children.*

*The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.*

*- Wisconsin v. Yoder*, 406 U.S. 205 (1972)

---

*This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.*

*- Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974)

---

*Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.*

*- Moore v. East Cleveland*, 431 U.S. 494 (1977)

---

*The liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in "this Nation's history and tradition."*

*- Smith v. Organization of Foster Families*, 431 U.S. 816 (1977)

---

*We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.*

*We have little doubt that the Due Process Clause would be offended "if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."*

*- Quilloin v. Walcott*, 434 U.S. 246 (1978)

---

*The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.*

*The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition.*

*Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.*

*- Parham v. J. R.*, 442 U.S. 584 (1979)

---

*The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.*

*Until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.*

*- Santosky v. Kramer*, 455 U.S. 745 (1982)

---

*"The best interests of the child," a venerable phrase familiar from divorce proceedings, is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterion-much less the sole* constitutional *criterion-*

*for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others.*

*"The best interests of the child" is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves.*

*- Reno v. Flores, 507 U.S. 292 (1993)*

---

*In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights . . . to direct the education and upbringing of one's children.*

*The Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests of all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."*

*- Washington v. Glucksburg, 521 U.S. 702 (1997)*

---

*The liberty interest at issue in this case-the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court.*

*In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.*

*The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests. More importantly, it appears that the Superior Court applied exactly the opposite presumption.*

*The Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made.*

*- Troxel v. Granville*, 530 U.S. 57 (2000)

the intersection of the family and the law: parents' fundamental rights in directing the care, custody, and control of their children as a family and the State's power to affect, limit, or even terminate those rights.   This Court has determined that parents have a fundamental right to direct the care, custody, and control of their children. This Court also has 3 determined that the government shall not interfere with this right unless and until a parent is proven unfit.

Nearly one hundred years ago, this Court acknowledged that "the child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Pierce v. Society of Sisters, 268 U.S. 510 (1925). Thereafter, in Stanley v. Illinois, 405 U.S. 645 (1972), this Court affirmed the fundamental rights of parents "in the companionship, care, custody, and management" of their children. Id. at 651. That same year, in Wisconsin v. Yoder, 406 U.S. 205 (1972), the Court declared that "[t]his primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." Id. at 232.   More recently, this Court declared in Washington v. Glucksberg, 521 U.S. 702 (1997), that the Constitution, and specifically the Due Process Clause of the Fourteenth Amendment, protects the fundamental right of parents to direct the care, upbringing, and education of their children. Id. at 720. And in Troxel v. Granville, 530 U.S. 57 (2000), 5  this Court again unequivocally affirmed the fundamental right of parents to direct the care, custody, and control of their children.   In Troxel, this Court stated that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of the parent to make the best decisions concerning the rearing of that parent's child." 530 U.S. at 68-69 (emphasis added). Therefore, a failure to consider the fitness of the parent represents "an unconstitutional infringement on [that parent's] fundamental right to make decisions concerning the care, custody, and control" of her children.  530 U.S. at 72. In fact, so inviolable and sacred is this right that this Court declared a presumption that "a fit parent will

act in the best interest of his or her child." Id. at 69. Yet, in the case below, the North Carolina Supreme Court expressly rejected allowing this presumption in favor of the natural mother of the children. Routten, 843 S.E.2d at 159.   In 2005, quoting Yoder and Troxel in response to a public school district's subjection of children to inappropriate and sexually explicit content, the United States House of Representatives affirmed that "the fundamental right of parents to direct the education of their children is firmly grounded in the Nation's Constitution and traditions." House Resolution 547 (November 16, 2005). Yet today, State courts of last resort throughout the United States are split, adjudicating children as "creatures of the State" by limiting or terminating parents' rights through using a subjective "best interest of the child" 6 test or by evaluating some level of "harm" to the child.

While the Court has alluded to the fitness of the parent test in the past, the Court has not articulated the exact standard in these cases. See Troxel, 530 U.S. at 73 ("We do not, and need not, define today the precise scope of the parental due process right in the visitation context").

Because these cases involve such deeply grounded fundamental rights guaranteed under the Constitution to the parents, courts must consistently apply the appropriate level of judicial scrutiny. In this regard, just as the fitness of the parent test alone satisfies the constitutional requirements, only strict scrutiny will suffice for judicial review in these situations.   In his concurring opinion in Troxel, Justice Thomas summarized an important aspect of this Court's precedential opinion in Pierce v. Society of Sisters, 268 U.S. 510 (1925), writing that "parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them." Troxel at 80 (Thomas, J., concurring).  This fundamental right is just as critical and sacred today as when Justice Thomas wrote those words twenty years ago and when this Court cemented that truth in 1925. Justice Thomas proceeded to the next step in the analysis by concluding: "I would apply strict scrutiny to infringements of fundamental rights." Id.

   **Summary of the Supreme Court's Parental Rights Doctrine:** The Supreme Court's Parental Rights Doctrine is the culmination of the Court's rulings on parental rights. Up until 2000, the Supreme Court consistently upheld parental rights. In 2000, however, the split decision in *Troxel v. Granville* opened the door for individual judges and States to apply their own rules to parental rights.

34

## Before 2000: Supreme Court Upholds Parental Rights

Prior to 2000, the Supreme Court followed the doctrine that parents have a fundamental right to direct the upbringing and education of their children. Parents were assumed to be the best caretakers for their child unless proven unfit. Our nation consistently maintained that parents possess a fundamental right to raise their children as they see fit.

> It is the natural duty of the parent to give his children education suitable to their station in life. - *Meyer v. State of Nebraska*, 262 U.S. 390 (1923)

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations. - *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)

> It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . It is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter. - *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158 (1944)

The values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society.

Even more markedly than in Prince, therefore, this case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children.

The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. - *Wisconsin v. Yoder*, 406 U.S. 205 (1972)

This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. - *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974)

Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural. - *Moore v. East Cleveland*, 431 U.S. 494 (1977)

The liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in "this Nation's history and tradition." - *Smith v. Organization of Foster Families*, 431 U.S. 816 (1977)

We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.

We have little doubt that the Due Process Clause would be offended "if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." - *Quilloin v. Walcott*, 434 U.S. 246 (1978)

The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

The statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition.

Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. - *Parham v. J. R.*, 442 U.S. 584 (1979)

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost

temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

Until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. - *Santosky v. Kramer*, 455 U.S. 745 (1982)

"The best interests of the child," a venerable phrase familiar from divorce proceedings, is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterion-much less the sole constitutional criterion-for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others.

"The best interests of the child" is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves. - *Reno v. Flores*, 507 U.S. 292 (1993)

n a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights . . . to direct the education and upbringing of one's children.

The Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests of all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." - *Washington v. Glucksburg*, 521 U.S. 702 (1997)

A Washington state law gave any person the ability to override a good parent's decision about visitation by simply claiming that it would be "best" for children to allow the third-party to have visitation rights. When the U.S. Supreme Court reviewed the law in *Troxel v. Granville*, 530 U.S. 57 (2000):

- There were six separate opinions and none reached a five-vote majority.

- Justice Scalia held that parents have no constitutionally protected rights whatsoever.

- ▪ Only Justice Thomas clearly stated that parental rights receive the same high legal standard of protection as other fundamental rights.

**This splintered decision left a confusing legacy.**

*Troxel v. Granville* contains language that would seem to uphold the traditional view of fundamental parental rights:

The liberty interest at issue in this case-the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court.

In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. - *Troxel v. Granville*, 530 U.S. 57, at 65-6 (2000)

The Supreme Court vacated the earlier strict scrutiny test that required proof of harm before the government could interfere with parental rights, instead **granting to judges the power to balance parental rights on a case-by-case basis:**

[I]f a parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.... [W]e would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter. - *Troxel v. Granville*, 530 U.S. 57, at 70 (2000)

In his concurring opinion, Justice Thomas accurately points out that the Court did *not* apply the strict scrutiny a fundamental right requires:

The opinions of the plurality, Justice Kennedy, and Justice Souter recognize such a [fundamental parental] right, but curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to the infringements of fundamental rights. [The Court did not.] - *Troxel v. Granville* 530 U.S. 57, at 80 (2000) (Thomas, J., concurring)

The United States Supreme Court held that under the Due Process Clause of the Fourteenth Amendment, the unmarried father was entitled to a hearing on his parental fitness before his children could be placed with the State.  The Court also held that such denial of a hearing to unwed fathers, where unwed mothers and divorced parents were granted such hearing, violated the Equal Protection Clause of the Fourteenth Amendment.

The Court noted that a father's opportunity to "accept[] some measure of responsibility for the child's future" based on his biological relationship with the child would permit him to "enjoy the blessings" of parenthood and have a positive effect on the child's development. Id. at 262, 103 S. Ct. at 299394.  If a biological father fails to take these steps, "the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie."  Id.

This case comes closest to articulating the "line in the sand" regarding what is required for a putative father to be granted constitutional protection of his parental rights.  The Court stated,   When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the due process clause….But the mere existence of a biological link does not permit equivalent constitutional protection.  Id. at 261, 103 S. Ct. at 2993.

Raftery v. Scott, 756 F.2d 335, 340 (4th Cir. 1984) ("The harm or deliberate frustration of a close or affectionate relationship between parent and child ... were there no remedy available to a parent who as a result was psychologically damaged strikes us as ... potentially a danger to society.").

The Court relied on the Restatement (Second) of Torts, sections 699, 700 (1977), which recognizes the intentional interference with the custodial parent-child relationship and the alienation of affections as two distinct torts, and which specifically recognizes a cause of action for the former. Id. at 1045. While alienation of affections involved interference with the child's affections, intentional interference with the custodial parent-child relationship involves more; it involves depriving the custodial parent of physical custody of the child. Id. The Court found this distinction to be critical. Id. Tort litigation for alienation of affections carries the risk that litigation might increase intra-family disharmony and force children to testify in court, as pawns, testifying against a parent. Id. at 1046. The Court reasoned, therefore, that only where there is the additional element of interference with parental physical custody by a third party is it in the child's best interest to allow a cause of action in tort. Id. at 1045, 1046. In the instance case, there is no physical interference by third parties with the custodial relationship.

Family and dependency actions are pending involving this matter. If there is a violation of a dissolution of marriage order and/or a court approved agreement and/or statutory parental rights, the family court is uniquely positioned to attempt to correct the violation, to minimize harm, and to fashion a remedy, which may include monetary sanctions. These issues are best left for the family court. Because there is no physical interference with the custodial relationship, Plaintiff has no cause of action for alienation of affections or for conspiracy based on that tort.

**Thomas Irving DAVIS, Jr., Appellant,**

**v.**

**Lin HILTON, Herbert Hilton, her husband, and Charles Berlitz and Valerie Berlitz, his wife, Appellees.**

Because "severe" and "pervasive" are elements of claims for sexual harassment under Title VII and interpretive jurisprudence, courts could benefit from existing judicial interpretation of these elements in the employment discrimination context. See 42 U.S.C. § 2000e-2 (2006); see also, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998).

242

"Severe or pervasive" is a unique element of IPI that, in essence, replaces the intent component of alienation of affections and the intent or recklessness component of IIED claims. IPI will not require proof of intent or recklessness because it can be assumed that any parent engaging in severe or pervasive conduct, such as that described herein, had the intent to harm the other parent's relationship with the child or was acting in a reckless manner. In other words, severe or pervasive conduct should be actionable regardless of the defendant's intent or recklessness, provided the other elements of IPI are satisfied. By omitting an intent or recklessness element, IPI will preclude a defendant who admits to harmful conduct from arguing that he had no intent to harm the relationship between the child and the other parent.

Id. ("The common law has been determined by the needs of society and must recognize and be adaptable to contemporary conditions and relationships. '[S]tability should not be confused with perpetuity. If the law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires.'" (alteration in original) (citations omitted) (quoting In re Stranger Creek, 466 P.2d 508, 511 (Wash. 1970))).

233

McGlynn, supra note 8, at 539-40 ("An unpopular suggestion in dealing with **parental alienation** was to create a tort for **parental alienation**."); Niggemyer, supra note 4, at 576 ("[T]he widespread acceptance of a specific cause of action for **parental alienation** seems unlikely to occur in the near future ....").

234

See Feinberg & Loeb, supra note 16, at 278 ("Severe psychological or physical interference in the parenting relationship demands extreme remedies."). Even officers of state chapters of the American Academy of Matrimonial Lawyers feel that when the alienator parent is "intentionally alienating and go[ing] out of [his] way to turn the child against the other parent, maybe [he is] responsible for damages." Appezzato, supra note 89.

Congress has power to enforce by appropriate criminal sanction every right guaranteed by due process clause of the Fourteenth Amendment. U.S.C.A.Const. Amend. 14.

Misdemeanor, under **color of law**, statute, ordinance, regulation or custom, of willfully subjecting any inhabitant of any state to deprivation of any rights, privileges, or immunities secured or protected by Constitution or laws of United States is properly stated by allegations of willful deprivation, under **color of law**, of life and liberty without due process of law. 18 U.S.C.A. § 242; U.S.C.A.Const. Amend. 14.

**Civil Rights**

Private persons, jointly engaged with state officials in prohibited action, are acting "under **color of law**" for purposes of statute prohibiting, under **color of law**, willfully subjecting any inhabitant of any state to deprivation of any rights, privileges or immunities secured or protected by Constitution or laws of United States. 18 U.S.C.A. § 242; U.S.C.A.Const. Amend. 14.

**Civil Rights**

To act "under **color**" **of law** for purposes of statute prohibiting under **color of law**, willfully subjecting any inhabitant of any state to deprivation of any rights, privileges or immunities secured or protected by Constitution or laws of United States does not require that accused be officer of state and it is enough that he is a willful participant in joint activity with state or its agents. 18 U.S.C.A. § 242; U.S.C.A.Const. Amend. 14.

**Conspiracy**

Statute prohibiting conspiracy to injure, oppress, threaten or intimidate any citizen in free exercise or enjoyment of any right or privilege secured to him by Constitution or laws of United States extends to conspiracies with respect to rights and privileges protected by Fourteenth Amendment and extends to conspiracies, otherwise in scope of section, participated in by officials alone or in collaboration with private persons. 18 U.S.C.A. § 241; U.S.C.A.Const. Amend. 14.

**Conspiracy**

Indictment alleging that defendants conspired together to injure, oppress, threaten and intimidate three persons in free exercise and enjoyment of rights and privileges secured to them by Fourteenth Amendment to Constitution not to be deprived of life or liberty without due process of law by persons acting under color of laws of state properly charged conspiracy in violation of statute. 18 U.S.C.A. § 241; U.S.C.A.Const. Amend. 14.

**Constitutional Law**

Fourteenth Amendment clearly denounces denial of any trial at all to accused. U.S.C.A.Const. Amend. 14.

**Constitutional Law**

Fourteenth Amendment protects individual against state action, not against wrongs done by individuals. U.S.C.A. Const.Amend. 14.

**Conspiracy**

Statute prohibiting conspiracy to injure, oppress, threaten or intimidate any person in free exercise or enjoyment of any right or privilege secured to him by Constitution or laws of United States embraces all of rights and privileges secured to citizens by all of Constitution and all of laws of United States and was not intended to be confined to rights that are conferred by or flow from federal government as distinguished from those secured or confirmed or guaranteed by Constitution. 18 U.S.C.A. § 241; U.S.C.A.Const. Amend. 14.


Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County

Supreme Court of the United States March 4, 1974 415 U.S. 423

**Headnote:** Ex parte temporary restraining orders should be restricted to serving their underlying purpose of preserving status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer.   Fed.Rules Civ.Proc. rule 65, 28 U.S.C.A.

**1594** Cases that cite this legal issue

**Document Preview:** The United States District Court for the Northern District of California held a labor union in criminal contempt for violating temporary restraining order, and the union appealed. The United States Court of Appeals for the Ninth Circuit, 472 F.2d 764, reversed the order and vacated the contempt proceedings, and certiorari was granted. The Supreme Court, Mr. Justice Marshall, held that, whether state law or federal rule was controlling, the restraining order issued by California state court before removal of case to federal district court expired long before alleged contempt approximately six months after the removal of case and that the denial of union's motion to dissolve order did not convert order into preliminary injunction of unlimited jurisdiction. Affirmed. Mr. Justice Rehnquist filed an opinion which concurred in the judgment and with which The Chief Justice and Mr. Justice Stewart and Mr. Justice Powell joined.


Califano v. Yamasaki

Supreme Court of the United States June 20, 1979 442 U.S. 682

**Headnote:** Absent clear command to the contrary from Congress, federal courts retain equitable power to issue injunctions in suits over which they have jurisdiction.

**104** Cases that cite this legal issue

**Document Preview:** The Secretary of the Department of Health, Education, and Welfare appealed from judgments entered in the United States District Court for the District of Hawaii, 371 F.Supp. 960, Samuel P. King, Chief Judge, and the United States District Court for the Western District of Washington, Morell E. Sharp, J., requiring, inter alia, that Secretary provide old age and disabled social security beneficiaries opportunity to request hearing prior to initiation of recoupment procedures to recover monies paid to such beneficiaries in excess of legal monthly entitlements.   The Court of Appeals for the Ninth Circuit, 564 F.2d 1219, Spencer Williams, District Judge, sitting by designation, affirmed in part, reversed in part and remanded. On certiorari, the United States Supreme Court, Mr. Justice Blackmun, held that:  (1) beneficiaries who filed written requests for waiver of recoupment were entitled to opportunity for prerecoupment oral hearing;  (2) beneficiaries who...

43

On a motion for recusal, a legally sufficient affidavit in support of the motion requires that facts be set forth with sufficient particularity that would fairly convince a sane and reasonable mind that the judge does in fact harbor the personal bias or prejudice contemplated by the statute. 28 U.S.C.A. § 144.

Pulliam v. Allen

Supreme Court of the United States May 14, 1984 466 U.S. 522

**Headnote:** Judicial immunity is not a bar to prospective injunctive relief against judicial officer acting in her judicial capacity.

**1292** Cases that cite this legal issue

**Document Preview:** Individuals who were arrested for non-jailable misdemeanors and were committed to jail when they were unable to meet bail imposed by state magistrate brought suit under section 1983,...

CAT defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person...by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."6  This definition does not include "pain or suffering arising only from, inherent in or incidental to lawful sanctions."7  'The Senate's advice and consent to CAT was also subject to particular understandings concerning "mental torture," a term that is not specifically defined by the Convention.  The United States understands mental torture to refer to prolonged mental harm caused or resulting from (1) the intentional infliction or threatened infliction of severe physical pain and suffering; (2) the administration of mind-altering  substances or procedures to disrupt the victim's senses; (3) the threat of imminent death; or (4) the threat of imminent death, severe physical suffering, or application of mind-altering substances to another.

C.  Major Provisions in the ICCPR ¶12 The rights protected in the ICCPR are rights "rooted in basic democratic values and freedoms."25 The Covenant seeks to promote "the inherent dignity and . . . equal and inalienable rights of all members of the human family [as] the foundation of freedom, justice and peace in the world."26   To further this goal, the Covenant proffers twentyseven articles which give individuals around the world various civil and political rights "without regard to race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."27 ¶13 Among the

enumerated rights are self-determination,28 right to life,29 right to liberty and security of person,30 right to compensation for unlawful detention,31 freedom of thought, conscience, and religion,32 freedom of opinion,33 right to peacefully assemble,34 right to freedom of association,35 rights of the family,36 right to participate in the public process37, and equal protection under the law.38 ¶14 The Covenant also prohibits governments from numerous activities including torture or cruel, inhuman or degrading treatment or punishment,39 slavery or other compulsory labor,40 propaganda for war,41 and advocacy of national, racial, or religious hatred.42 ¶15 In addition, the covenant establishes a Human Rights Committee to oversee compliance of the various articles by the Parties to the covenant.  Countries may recognize the committee's competence to consider complaints made by other parties to the treaty.43 C. United States Reservations to the ICCPR ¶16 Even though U.S. Congressmen "recognize[d] the importance of adhering to internationally recognized standards of human rights,"44 they nonetheless excepted the United States from several provisions in the treaty by making an unprecedented number of RUDs.

D.  The U.S. made reservations to the ICCPR's provisions on prohibition of war propaganda,45 capital punishment,46 cruel, inhuman or degrading treatment,47 criminal penalties,48 and juveniles.49  It made understandings concerning the provisions on equal protection,50 compensation for illegal arrests,51 separate treatment of the accused from the convicted,52 and right to counsel,53 and the extension of the provisions in the treaty to federal states.54 Finally, it made declarations with regard to the treaty being non-selfexecuting,55 the rights that may be taken away during emergencies,56 the Human Rights Committee,57 and the savings clause on natural wealth and resources.58 ¶18 Eleven countries made objections to the U.S. reservations, understandings, and declarations included in its ratification.59  It is important to note that while each of these countries objected to certain provisions, none of the countries objected to the majority of the U.S. reservations.60 ¶19 All eleven countries objected to the second U.S. reservation to Article 6 of the ICCPR.  Section 2 of Article 6 requires that the "sentence of death may be imposed only for the most serious crimes."61 Section 5 states that the death penalty "shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women."62  The United States reservation states:  [t]hat the United States reserves the right. . . to impose capital

punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment,

E.  Countries objected to the U.S. reservation because it allegedly went against the object and purpose of the treaty.  Article 4 of the ICCPR allows for derogation from the covenant during times of national emergency.64  However, Article 4 Section 2 prohibits States from derogating from essential articles in the Covenant.65  These articles include the right to life,66 the right to be free of torture67 and slavery68, right to be free of imprisonment for breach of contractual obligations69, right to be free of ex post facto laws,70 right to be recognized as a person before the law,71 and freedom of thought, conscience, and religion.72 Arguably, the most essential of these articles is the right to life.  By reserving the right to sentence persons under the age of eighteen to death, the United States contravened a major object and purpose of the treaty. ¶21 Nine of the eleven countries also objected to the third U.S. reservation regarding article 7 of the ICCPR.73  Article 7 states, "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.  In particular, no one shall be subjected without his free consent to medical or scientific experimentation."74  The U.S. reservation states that Article 7 will only apply "to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."75 ¶22 States objected to this reservation on a variety of grounds.  First, some objected for the same reason that they objected to the reservation to article 6, namely that the reservation is an essential article in the covenant and thus contravenes the object and purpose of the treaty.76  Like the previous reservation to the right to life, the right to be free of torture is an essential civil and political right that cannot be modified even in times of national emergency.  Second, States objected on the basis that a country cannot

F.  The reservation regarding torture states that the U.S. only "considers itself bound by Article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means "cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendment."109

G.  **Child** has substantive due process right in her relationship with her **parents** which may be vindicated through § 1983 action. 42 U.S.C.A. § 1983. Ovando v. City of Los Angeles, 92 F. Supp. 2d 1011 (C.D. Cal. 2000).

H.  Child of police shooting victim was not required to show that city and police officers had intention to deprive her of her familial association rights in order to state substantive due process claim under § 1983. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

§3729. False claims

(a) Liability for Certain Acts.-

(1) In general.-Subject to paragraph (2), any person who-

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28

U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

    (2) Reduced damages.-If the court finds that-

    (A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

    (B) such person fully cooperated with any Government investigation of such violation; and

    (C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

    (3) Costs of civil actions.-A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.-For purposes of this section-

    (1) the terms "knowing" and "knowingly"-

    (A) mean that a person, with respect to information-

      (i) has actual knowledge of the information;

      (ii) acts in deliberate ignorance of the truth or falsity of the information; or

      (iii) acts in reckless disregard of the truth or falsity of the information; and

    (B) require no proof of specific intent to defraud;

(2) the term "claim"-

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that-

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

I. **§ 1983 Liability for Defamation**

Defamation is the act of harming the reputation of another by making a false statement to a third person. Although the distinction is generally not made in caselaw, defamation may divided into libel or slander. Libel means to defame someone in a permanent medium, usually in writing.

Slander is defamation in a transitory form, normally speech. Although libel and slander are for the most part governed by the same principles, there are two important differences: (1) Libel is not only a tort, but may also be a criminal offense. Slander is strictly a civil injury. (2) Damages for slander--unlike those for libel-- are not presumed and thus must be proved by the plaintiff. Defamation is almost impossible to challenge with a § 1983 action. The reason for this is that § 1983 actions are for violations of civil rights granted in the Constitution. Since defamation is a matter of state law, it is not a sufficient basis for bringing a § 1983 suit. In the rare case that a § 1983 action is held sufficient for defamation, it is because (1) the plaintiff suffered injury to his reputation from an official's false statements, and (2) the plaintiff has also suffered burden or alteration of status or rights. The harmful effects of an injured reputation alone will not suffice as a "burden or alteration of status or rights." A recent case exemplifies the concept of immunity for defamation, and the difficulty in maintaining a § 1983 suit. In Sadallah v. Utica, 383 F.3d 34 (2nd Cir. 2004), the court stated that defamation is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action. The mayor made allegedly defamatory remarks about the physical condition of a restaurant, and the restaurant owner sued. Even assuming the mayor's statements really were defamatory, the court would not allow for damages against the city and the mayor: "The state- imposed burden or alteration of status must be in addition to the stigmatizing statement. Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government- imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process."

Examples of burdens that satisfy the second requirement are the deprivation of the plaintiff's property, and the termination of a plaintiff's government employment.

## **CONCLUSION**

To conclude, the Court stated in their conclusion that, "In short, it appears that the complaint is subject to dismissal under § 1915(e)(2)(B) and Fed. R. Civ. P. 12(h)(3) because it does not allege facts to support federal jurisdiction or, to the extent that it cites federal law, it does not allege facts to plausibly suggest any grounds for relief under federal law. But if Antar

has grounds to file an amended complaint or to show why the complaint should not be dismissed, she may file a response to this order to show cause."

As such, the Plaintiff respectfully submits the response as an initial response to the order to show cause and will be filing an amended complaint which will show a detailed analysis of the further legal grounds and can further show why said complaint should not be dismissed and why it is imperative that the Court act to prevent further irreparable harm in this fragile, urgent, emergency situation that has been causing severe pain and harm to the Plaintiffs.

Respectfully submitted,

is/ Theodora Antar

*Plaintiff, Pro Se*

856 Shagbark Drive, Orange, CT, 06477

theodoraantar@gmail.com  (203)273-8419

51

## **<u>CERTIFICATION</u>**

I hereby certify that on August 23, 2023, a copy of the foregoing was filed electronically.

Sent Electronically to:

Matthew Lodice; Matthew Lodice on behalf of D.L.

48 Quarry Hill Rd, Waterbury, CT, 06706

matthewlodice@gmail.com

Karen Bowers

48 Quarry Hill Rd, Waterbury, CT, 06706

Roy Bowers

48 Quarry Hill Rd, Waterbury, CT, 06706

Scott Lodice; Scott Lodice on behalf of T.L.

Jessica Strusky

Stan Strusky

Monica Perez; Monica Perez on behalf of D.L.

Respectfully submitted,


is/ Theodora Antar

*Plaintiff, Pro Se*

856 Shagbark Drive, Orange, CT, 06477

theodoraantar@gmail.com  (203)273-8419